UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


FEDERAL NATIONAL MORTGAGE
ASSOCIATION, a corporation established
pursuant to 12 U.S.C. § 1716, <u>et seq.</u>,

      Plaintiff,

vs.                                                                     Case No. 11-14119

EMPERIAN AT RIVERFRONT, LLC, a                HON. AVERN COHN
Delaware limited liability company, and
AINSTAR RIVERFRONT, LLC, a Delaware
limited liability company, EZRA BEYMAN, an
individual, and MAYER STEG, an
individual,

      Defendants.

_____/

## <u>MEMORANDUM AND ORDER GRANTING PLAINTIFF'S MOTION TO STRIKE AFFIRMATIVE DEFENSE (Doc. 62)</u>

### I. Introduction

This is a loan default case brought against the borrowers and guarantors of a mortgage loan involving real property known as Riverfront Towers Apartments (Riverfront) located in Detroit, Michigan. Plaintiff Federal National Mortgage Association (Fannie Mae) sued to enforce its mortgage rights and to appoint a receiver over the Riverfront property after the loan went into default. As will be explained, Ezra Beyman (Beyman) is the only remaining defendant. Fannie Mae obtained a default judgment against Beyman in the amount of $18,149,262.77 for breach of a personal guaranty. Upon Beyman's motion, the default judgment was set aside. (Doc. 52).

Before the Court is Fannie Mae's motion to strike Beyman's affirmative defense.

Beyman's defense is based on Fannie Mae's failure to honor an oral agreement with respect to the property which, according to Beyman, resulted in the Riverfront property falling into foreclosure.  For the reasons that follow, the motion is GRANTED.

## II.  Background

The Riverfront property is one of approximately 60 properties owned by Empirian at Riverfront, LLC (Empirian), or other special purpose borrower affiliates of Empire American Holdings, LLC (Empire).  Beyman owns Empire.  Beginning in 2009, Empire was unable to fulfill its loan obligations for all of its properties, including the Riverfront property, due in part to the decline in the real estate market.

### A.  The Loan Transaction

In June 2008, Empirian and Ainstar Riverfront, LLC (Ainstar) borrowed Fifty-Five Million Dollars ($55,000,000) from Arbor Commercial Funding, LLC (Arbor) as evidenced by a Multifamily Note executed on June 27, 2008.  Arbor subsequently assigned the loan and all loan documents to Fannie Mae.  Arbor continued to service the loan after it was assigned to Fannie Mae.

To secure repayment of the note, Empirian executed a mortgage in favor of Arbor on the property.  As further security, on June 27, 2008, Beyman executed in favor of Arbor a Guaranty (Guaranty), which obligates Beyman pay the guaranteed amount if Empirian defaulted on the loan.  The Guaranty states in part:

> Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Lender the full and prompt payment (i) upon the occurrence of an Event of Default under Section 22 of the Security Instrument [i.e., the mortgage] which results in an acceleration of the Indebtedness and (ii) upon the occurrence of a Transfer under Section 21(a) of the Security Instrument and the

2

> failure of Borrower to make the partial prepayment
> required by Section 10(g) of the Note, and at all times
> thereafter, of the following:
>> (a) A portion of the Indebtedness equal to $3,500,000
>> (the "Guaranteed Amount");
>> (b) Any prepayment premium due pursuant to the terms
>> of the Note upon the application by Lender of the
>> Guaranteed Amount to the then outstanding principal
>> balance of the Indebtedness"; and
>> (c) All costs and expenses, including reasonable fees and
>> out of pocket expenses of attorneys and expert witnesses,
>> incurred by Lender in enforcing its rights under this Guaranty.

(Guaranty, § 2.)

The Guaranty also provides that Beyman's payment obligations "shall be performed without regard to any other circumstance which might otherwise constitute a legal or equitable discharge of a surety or guarantor." Id. § 5. The Guaranty further provides that, Beyman "agrees that [his] obligations shall not be affected by any circumstances, whether or not referred to in this Guaranty, which might otherwise constitute a legal or equitable discharge of a surety or guarantor." Id. Finally, the Guaranty provides that, "[n]either this Guaranty nor any of its provisions may be waived, modified, amended, discharged, or terminated except by an agreement in writing signed by the party against whom the enforcement of the waiver, modification, amendment, discharge, or termination is sought, and then only to the extent set forth in that [written] agreement." Id., § 13.

At the same time that the promissory note, mortgage, Guaranty, and other loan documents were executed, Empirian and Arbor executed a "Replacement Reserve and Security Agreement." The Reserve Agreement provides that, along with the monthly payment of principal and interest on the mortgage loan, Empirian was required to make

3

a monthly deposit into a reserve account in order to fund certain specifically identified replacements and repairs on the property.  (Reserve Agreement, §§ 1, 3)  The funds deposited pursuant to the Reserve Agreement were intended to be used only for the specific "replacement" items identified on Exhibit A to the Reserve Agreement, such as replacements for the roofs of the buildings and appliances installed in the apartments. Id.  The lender was not obligated "to reimburse Borrower for the costs of routine maintenance to the property."  Id., § 3(b).  In order to receive disbursements from the reserve account, Empirian was required to make a written request to the lender that, among other things, identified the specific replacements and the quantity and price of materials and labor.  Id., § 4(b).  The Reserve Agreement also provides that the funds would not be disbursed to Empirian until after the specified repairs were completed. Id., § 4(c).  To the extent that Empirian requested a disbursement of funds for items other than those specifically identified in the Reserve Agreement, the lender had complete discretion whether or not to release the funds.  Id., § 4(f).  The Reserve Agreement provides that "no change or amendment [to the Reserve Agreement] shall be valid unless it is made in writing and executed by the parties to this agreement."  Id., § 18. The Reserve Agreement required Empirian to make payments to a reserve account to be used for maintenance expenses.  The Reserve Agreement also provides that, neither the Reserve Agreement itself, nor the parties' respective performance or non-performance of their obligations under the Reserve Agreement, has any effect on the Empirian's obligations under the Loan Documents:  "Nothing contained in this Agreement shall alter, impair or affect the obligations of Borrower, or relieve Borrower of any of its obligations to make payments and perform all of its other obligations required

4

under the Loan Documents." Id., § 7

In addition to the Reserve Agreement, Empirian and Arbor also entered into a "Completion/Repair and Security Agreement" that required Empirian to deposit a sum into a custodial account to fund certain specifically-designated repairs to the property. The terms of the Completion/Repair and Security Agreement are similar to the terms of the Reserve Agreement, including a provision that nothing in the Completion/Repair and Security Agreement shall relieve Empirian of any of its payment obligations and other obligations under the loan documents.

## B.  Pre-Default Events

In early 2011, Beyman controlled multiple real estate companies that owed Fannie Mae hundreds of millions of dollars in connection with the approximately 60 mortgage loans, including the Riverfront loan.  Empirian, Fannie Mae, and Arbor had a meeting on April 28, 2011 to discuss the status of the loan portfolio.

The day before the meeting, on April 27, 2011, Beyman signed two Pre-Negotiation Letters, one on behalf of himself and the other on behalf of Empirian. The Pre-Negotiation Letter provide that Fannie Mae's rights and remedies, as well as the parties' obligations under the Loan Documents, could be waived or modified only by a signed written agreement.  Beyman also agreed that, any oral promise or communications made at the meeting would have no effect on Fannie Mae's rights and remedies:

> None of the oral or written discussions or other
> communications relating to the Loan, to its terms or
> provisions or to efforts to resolve any problems
> associated with the Loan and the Loan Documents
> shall be effective to modify, extend or amend in any
> manner, the rights and remedies of Fannie Mae under

> the Loan Documents. Each term and provision of the
> Loan Documents shall be fully enforceable in
> accordance with its terms until execution and delivery
> arguments applicable to the Reserve Agreement in this case apply with
> equal force to the Completion/Repair and Security Agreement.
> of a fully executed Loan Modification. Only by a Loan
> Modification may any of the terms and provisions of
> the Loan be modified, extended or amended in any manner.

Beyman further agreed that Fannie Mae could pursue enforce its rights under the loan

documents while at the same time negotiating with the Empirian:

> Also, if Fannie Mae, in its sole and absolute discretion,
> deems circumstances to so warrant, Fannie Mae's policy
> is to pursue "parallel paths," whereby it pursues its rights
> and remedies under the Loan Documents while at the
> same time evaluating and negotiating a possible
> workout/restructuring of the Loan. Accordingly, in the
> event of a default under the Loan, the Note may be
> accelerated and other rights and remedies pursued by
> Fannie Mae. By scheduling this meeting, and
> exchanging communications related to resolution of
> the problems associated with the Loan and the Loan
> Documents, neither Fannie Mae nor Servicer (i) waive
> any rights they may have which arise from such a
> default by Borrower nor (ii) agree to refrain from or
> delay the exercise of any of Fannie Mae's rights or
> remedies under the Loan Documents. Until a Loan
> Modification is fully executed and delivered, each and
> every agreement or consent by Fannie Mae or Servicer to
> all or any part of any proposals submitted by or on behalf
> of Borrower shall be and is entirely unenforceable, and
> Fannie Mae reserves all of its rights and remedies under
> the Loan Documents despite any such agreement or
> consent.

Id.

Beyman further agreed that Fannie Mae's rights and remedies under the loan

documents would not be affected by any oral discussions between it and Empirian:

> 1. Rights and Remedies Not Affected. Fannie Mae's
> rights and remedies shall not be affected or impaired
> in any way by reason of any or all of the following: (I)

6

> holding discussions with Borrower; and (ii)
> exchanging any correspondence among the parties.
> Any and all such discussions or correspondence shall not
> be deemed to act as a waiver of, or otherwise preclude,
> the exercise of any rights or remedies of any of the
> parties under the Loan Documents or at law or equity, or
> from commencing or continuing the exercise of such
> rights or remedies. (Id., ¶ 1 (emphasis added).)

Finally, the Pre-Negotiation Letter reiterated that no oral modifications to the loan

documents would be effective or binding:

> 2. No Oral Modifications. No modification, extension,
> or amendment arising out of any discussions or
> correspondence pertaining to the Loan Documents
> shall be effective or binding unless in writing in the
> form of a Loan Modification. Any party's willingness
> to enter into an agreement evidenced by a Loan
> Modification is within the sole discretion of each party,
> and the signature of an authorized agent for the party on a
> Loan Modification will conclusively evidence that the
> party has read and understood the Loan Modification.
> Each and every oral agreement to modify, extend or
> amend the terms and provisions of the Loan
> Documents is entirely unenforceable, and Borrower
> hereby waives any reliance on (i) any and all oral
> agreements to modify, extend or amend the terms and
> provisions of the Loan Documents and (ii) the
> matters, conditions, or events related to any and all
> such oral agreements to modify, extend or amend the
> Loan Documents.

Id., ¶ 2.

At the date of the meeting on April 28, 2011, Empirian was represented by David

Teiler, the Chief Financial Officer of Beyman's parent company, Empire.  Beyman did

not attend the meeting.  Representatives of Fannie Mae and Arbor were also present to

discuss the various mortgage loans owed by Beyman's companies.  According to Teiler,

the primary focus of the meeting was not the Riverfront Towers property, but rather, a

portfolio of mortgage loans on 59 other properties owned by Beyman's companies.

Fannie Mae does not dispute this characterization of the meeting.

As will be explained below, Teiler believed that the parties reached an agreement that Fannie Mae would release some of the reserve funds to pay vendors.  Teiler allegedly proposed that, instead of using these funds for the replacement items as agreed in the Reserve Agreement, the parties instead "make an exception" to the terms of the Reserve Agreement and use the funds to pay vendors, in advance, for various maintenance projects on the Riverfront Towers property, such as maintenance on the elevator systems.

Fannie Mae deposed Teiler in this case with respect to the substance of the April meeting.  He testified that the Riverfront Towers property was discussed only at the end of the meeting.  At that time, Teiler noted that there were funds in the reserve account that, pursuant to the Reserve Agreement, were earmarked for specifically-identified replacement items.  Teiler dep., 43:20-45:10, 47:1-10, 92:3-10.  However, Teiler admitted that there was no actual promise made during the meeting to release any funds. Teiler testified that the so-called "promise" was "not stated," but rather was somehow "implied" from "the mood in the room":

> Q. Did anyone use the words "I promise" or anything like that?
> A. I most definitely understood it from the mood in the room where we had discussions about very tough stuff and then Riverfront came up and the tone of the room was such that they breathed a sigh of relief. I even said that before. It was implied; it was not stated.

Teiler dep., 81:10-17.

On May 17, 2011, almost three weeks after the meeting, Teiler sent an email to Arbor regarding the Riverfront Towers property.  In the email, Teiler explained that at

8

the April 28 meeting, he had made a "suggestion" that "an exception be made from the normal process" of disbursing funds under the Reserve Agreement.  Teiler proposed that various items of "deferred maintenance" that were not designated under the Reserve Agreement nonetheless be paid out of the reserve account, in advance, "by submitting invoices directly to Arbor (as servicer) for payments to [the] vendors."  Teiler asked Arbor to "forward a request to Fannie Mae" to approve his proposed "exception" to the Reserve Agreement.  Apparently, Fannie Mae held approximately $260,000 in the reserve account.

At deposition, Teiler specifically admitted that Fannie Mae had discretion to accept or reject his request:  "Q. […] [W]hen you made your request, Fannie Mae if it wanted to had every right to just say no; is that correct? A. That is correct."  Teiler dep., 103:16-19; see also id. 99:2-17, 102:19-103:6.

Neither Arbor nor Fannie Mae ever accepted Teiler's request for the release of funds as an "exception" to the Reserve Agreement.  Arbor posed some questions in response to Teiler's May 17 email, but never stated that the funds would be released.  See Fannie Mae's Ex. 6, May 2011 emails between Teiler and Arbor.  As Teiler testified, "[t]he only reason that I represent that I expected those funds to be released is because I kept receiving ongoing questions."  Teiler dep., 117:19-118:14.

There is no writing stating or suggesting that Fannie Mae or Arbor ever approved Teiler's request for an "exception" to the Reserve Agreement.  No funds from the reserve account were ever released, although Teiler, and Beyman, believed such funds would be released.  For the next three months, May, June, and July of 2011, Emperian made the monthly mortgage payments on the Riverfront loan, totaling $356,213.65.

Beyman says that of that amount, he personally paid $75,000 each month.

### C.  Default

By August of 2011, Empirian failed to make the monthly payment.  Under the Guaranty, Beyman's payment obligations arose in the event of a default, which included failing to make a mortgage payment and a "transfer."  The definition of transfer encompassed any lien placed on the property.  In addition to the failure to pay the mortgage, there was a $130,000 past due maintenance invoice which constituted a lien and therefore satisfied the "transfer" requirement.  Thus, the Guaranty became enforceable at that time due to the default.  Because of the default, Fannie Mae commenced foreclosure proceedings.

### D.  Litigation

On September 21, 2011, Fannie Mae sued Empirian, Ainstar, Beyman, and Mayer Steg[1] seeking to enforce the mortgage obligation, including the assignment of rents provision, and to appoint a receiver.  Fannie Mae separately moved for the appointment of a receiver.  After a hearing, the Court granted Fannie Mae's request for a receiver on September 28, 2011.  (Doc. 12).  Meanwhile, summons were issued for all defendants.  None of the defendants responded.  Fannie Mae obtained clerk's entries of default as to Empirian, Ainstar and Beyman.  See Docs. 19, 20, 34.  Fannie Mae then moved for a default judgment against Beyman.  (Doc. 39).  On October 22, 2012, Court entered judgment in favor of Fannie Mae and against Beyman in the approximate amount of $18,000,000.  (Doc. 43)

On November 11, 2012, Beyman moved to set aside the default judgment.  (Doc.

---

[1]Steg also signed a guaranty similar to Beyman's.

49).  Over Fannie Mae's opposition, the Court granted the motion on December 12,

2012.  (Doc. 52).

On May 9, 2013, Beyman filed an amended answer and affirmative defense.

(Doc. 59).  Beyman's affirmative defense reads in full:

> On June 27, 2008, Borrower and the original lender Arbor Commercial Funding, LLC executed a Replacement Reserve and Security Agreement ("Reserve Agreement").  On April 28, 2011, a meeting was held between David Teiler, Chief Financial Officer of Empire American Holdings, LLC, and numerous representatives of lender including: Gary Moore, Senior Asset Manager of Fannie Mae, Larry Lagrone, Vice President Multifamily Loss Mitigation of Fannie Mae, Ivan Kauffman, President of Arbor Realty Trust, Inc. ("Arbor"), and others from both Fannie Mae and Arbor.  During the meeting, Mr. Teiler requested approximately $260,000 in reserve and holdback funds from Fannie Mae and Arbor, pursuant to an exception of the Reserve Agreement, so that Borrower could perform capital maintenance and necessary repairs to the Riverfront Property, which would make it safer and more attractive to potential tenants, and would increase cashflow.
>
> Mr. Lagrone and Mr. Moore, on behalf of Fannie Mae, agreed and promised that they would release the reserve and holdback funds.  Mr. Kauffman asked that Mr. Teiler put it in writing and forward it to Arbor as the loan servicer.  On May 17, 2011, Mr. Teiler did so by email.  On May 19, 2011 and May 20, 2011, Mr. Teiler followed-up with Arbor.  However, Borrower never received the funds.
>
> Borrower relied on the promise to its detriment because from April 2011 to August 2011 it used its own out-of pockets funds to make its monthly payments.  If Fannie Mae would have fulfilled its promise, Borrower would have continued making its debt service and lien settlement payments by using its own money to supplement shortfalls until the property started generating positive cash flow again.  Thus, Borrower would not have defaulted and Beyman's guaranty obligations would not have triggered.  In addition, Borrower would not have suffered at least $480,000 in damages for the amounts it paid out of pocket between April 2011 (when Fannie Mae made the promise) and August 2011 (when Borrower stopped making monthly payments).
>
> **In sum, Plaintiff's claims against Beyman are barred based on inequitable conduct, failure to mitigate damages and estoppel.**

(Emphasis added).  Thus, as the Court reads Beyman's defense, he says that Fannie

11

Mae's refusal to act on the parties agreement regarding the use of the reserve funds was inequitable and resulted in the loan needlessly going into default and therefore Fannie Mae should be estopped from being able to enforce the Guaranty against Beyman.  In short, Beyman asserts that had Fannie Mae acted on the "agreement," there "would not" have been a default triggering Beyman's obligations under the Guaranty.

On May 30, 2013, following termination of the receivership, the Court dismissed Emperian, Ainstar, and Steg without prejudice.  (Doc. 61).

### III.  Legal Standard

Rule 12(f) of the Federal Rules of Civil Procedure provides that, on motion of a party, the Court may strike from a pleading "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Courts have "liberal discretion" to strike such filings as they deem appropriate under Rule 12(f).  Stanbury Law Firm v. IRS, 221 F.3d 1059, 1063 (8th Cir. 2000) (citation omitted); see also 2 James Wm. Moore et al., Moore's Federal Practice § 12.37[1] (3d ed. 2006).  A motion to strike an affirmative defense under Rule 12(f) is proper if "as a matter of law, the defense cannot succeed under any circumstances."  Ameriwood Indus. Int'l Corp. v. Arthur Andersen & Co., 961 F.Supp. 1078, 1083 (W.D. Mich. 1997).  Striking an affirmative defense pursuant to Rule 12(f) is also proper "if it aids in eliminating spurious issues before trial, thereby streamlining the litigation."  Specialized Pharmacy Servs., LLC v. Magnum Health and Rehab of Adrian, LLC, No. 12-12785, 2013 U.S. Dist. LEXIS 50735 (E.D. Mich., Apr. 9, 2013).

### IV.  Analysis

12

As an initial matter, some comment is in order as to the framing of the issue as a motion to strike.  Beyman contends that Fannie Mae is in fact moving for summary judgment on Beyman's affirmative defense, a move he says is premature because Beyman has not had the opportunity to depose the Fannie Mae representatives at the April meeting and otherwise explore Fannie Mae's allegedly improper conduct.[2]  Putting aside that Fannie Mae's motion does have overtones of a summary judgment motion, including that it relies on matters outside the pleadings, including deposition testimony, the motion is nonetheless proper in light of the record.

### A.

Fannie Mae says there are several reasons as to why Beyman's affirmative defense, as plead, fails as a matter of law and therefore should be stricken. Specifically, Fannie Mae says that (1) the defense fails because it is based on an alleged oral promise therefore violates the statute of frauds as it is asserted against a financial institution, (2) Beyman agreed in multiple writings that any oral promise would not affect Fannie Mae's rights or remedies under the Beyman Guaranty, (3) the record undisputedly shows no oral promise to release funds was made.

Beyman responds, contending that (1) the statute of frauds does not apply to affirmative defenses against a financial institution and because the promise was capable of performing within a year, (2) the oral promise is enforceable and/or Fannie Mae waived the no-oral modifications clause, and (3) there are genuine issues of material fact as to Fannie Mae's conduct which prevents the Court from striking

---

[2]Fannie Mae filed a motion to stay discovery pending resolution of the instant motion.  (Doc. 63).

Beyman's affirmative defense.

Fannie Mae replies that (1) there was no modification which would allow for the enforcement of an oral promise, (2) the statute of frauds does apply, (3) there was no oral promise to release the funds as Beyman contends.

**B.**

Rather than delve into the complexities of whether the statute of frauds applies to an affirmative defense asserted against a financial institution,[3] the better course is to address Beyman's affirmative defense on the merits.  In doing so, it is clear that the defense fails as a matter of law.

Beyman's affirmative defense, at its core, is a defense based on promissory estoppel.  The elements of promissory estoppel are (1) a promise, (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee, (3) which in fact produced reliance or forbearance of that nature, and (4) under circumstances such that the promise must be enforced if injustice is to be avoided.  Novak v. Nationwide Mut. Ins., 235 Mich. App 675, 686–87 (1999).

Beyman cannot prevail on this defense.  The record shows that no such promise

---

[3]The Michigan Statute of Frauds states that "[a]n action shall not be brought against a financial institution to enforce [a promise or commitment to waive a provision of a loan or make any other financial accommodation] unless the promise or commitment is in writing and signed."  Mich. Comp. Laws § 566.132(2).  The language of this statute is unambiguous and courts have read it to be an "unqualified and broad ban" of any claim—"no matter its label"—against a financial institution to enforce the terms of an oral promise waiving a loan provision.  Crown Tech. Park v. D & N Bank, FSB, 242 Mich.App. 538, 619 N.W.2d 66, 72 (Mich. Ct. App. 2000).  Beyman, as noted above, says the statute does not apply to affirmative defenses asserted against a financial institution.

regarding the reserve funds was ever made.  While Teiler may have believed Fannie Mae was going to release the reserve funds, that did not happen and no agreement to release the funds was reduced to writing.  Moreover, even if such an oral promise was made, it was not reasonable for Beyman to rely on it in the face of all the relevant documents, including the Guaranty, the Pre-Negotiation letter, both of which expressly state that any oral agreement does not alter Beyman's obligations under the Guaranty.  In other words, Beyman agreed that no oral promise, whether or not enforceable, would not modify to alter his obligations under the Guaranty.

In the end, it is undisputed that the loan went into default and Beyman's obligations under the Guaranty were triggered.  It is also clear that no oral agreement as to the release of funds from the reserve account, even if consummated, would have any affect on Beyman's obligations.  Beyman's affirmative defense is based on nothing more than wishful thinking and speculation as to what might have happened if Fannie Mae had agreed to and released the reserve funds.  The language in the Guaranty controls, not Beyman's hopeful beliefs.  Beyman's affirmative defense must be stricken.

SO ORDERED.

 s/Avern Cohn
UNITED STATES DISTRICT JUDGE


Dated:  October 3, 2013

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, October 3, 2013, by electronic and/or ordinary mail.

 s/Sakne Chami
Case Manager, (313) 234-5160